**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1006-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GREGORY A. COOMBS,

    Defendant-Appellant.

_____

Argued May 19, 2026 – Decided July 29, 2026

Before Judges Sumners, Susswein and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 20-01-0103.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Kimberly P. Will, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Kimberly P. Will, of counsel and on the briefs).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Defendant Gregory A. Coombs appeals his March 10, 2023 jury trial conviction for first-degree conspiracy to commit knowing/purposeful murder arising from the 2019 fatal shooting of Derrick Harris. The State alleged that defendant, along with codefendants Cleve Lewis[1] and Deontray Gross, conspired to kill Harris for financial gain. Gross entered into a cooperation agreement with the State and gave evidence against defendant and Lewis at their joint trial. Gross testified that he, defendant, and Lewis planned to go to Harris's apartment and shoot him. Lewis was the shooter, and defendant drove the getaway vehicle. Defendant was ultimately convicted of first-degree conspiracy to commit murder. He was acquitted of first-degree murder and second-degree burglary. He was sentenced to thirty-six years in prison.

On appeal, defendant argues that the trial court erred in: (1) instructing the jury on conspiracy to commit murder; (2) failing to grant his motion to suppress evidence obtained following a stop of his motor vehicle; (3) admitting

---

[1] Defendant and Lewis were tried together. Lewis challenges his jury trial conviction in a separate appeal, State v. Lewis, No. A-1007-23 (App. Div. July 29, 2026). Although there are overlapping issues, because defendant and Lewis make different arguments, we issue separate opinions.

global positioning system (GPS) geolocation evidence without expert testimony; and (4) imposing sentence. After reviewing the record in light of the governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record.[2]

## A.  The Crime and Police Investigation

Shortly after midnight on November 7, 2019, police responded to the Delsea Gardens Apartments in Millville to investigate a reported homicide at the victim's apartment. Upon arrival, police observed a deceased African American male, later identified as Harris, lying face down in a pool of blood a few steps in from the front door of the unit. Police also observed several bullet strikes.

Police encountered two adults in the apartment, Shante Brooks and Rashan Rodgers, who were brought to the Millville police station to be interviewed. Brooks, who was Harris's girlfriend and testified at the joint trial, told police that she and Harris had a daughter and all three of them lived in the

---

[2]  Because our harmless error analysis requires us to evaluate the overall strength of the State's case, we recite the relevant facts elicited at trial in some detail.

apartment. She revealed that Harris was involved with "drugs" and had been incarcerated in the past. She also stated that Gross was Harris's "best friend" and had been to their apartment "several times."

Brooks said that she, Harris, their daughter, and Rodgers had been in the unit since 5:00 p.m. on the night of the shooting. At approximately 8:00 p.m., there was a knock on their front door. No one was expecting visitors, so no one answered the door.

A couple of hours later, at approximately 11:00 p.m., Brooks said that there was a second knock on the door. Harris went downstairs to answer the door, and Brooks stayed in the bedroom and looked out the window. The window was directly over the front door, but because of an overhang, Brooks could not see who was standing there. She did, however, observe that the person was wearing Nike Foamposite sneakers. Brooks heard Harris open the door, which was immediately followed by the sound of multiple gunshots.

After the shooting stopped, Brooks went halfway down the stairs to ensure the shooter was no longer there. She saw Harris on the floor and went back upstairs to contact her aunt and instruct her to call 9-1-1.

Because the Millville Police Department had remote access to the surveillance system at Delsea Gardens, police were able to review footage while

A-1006-23

still on scene using their mobile devices. The footage—which was shown to the jury at trial—showed two subjects, one wearing a jacket with a reflective stripe, entering Delsea Gardens through a fence on the north side of the property and walking to Harris's unit. One of the subjects then opened fire, and both were seen fleeing back through the fence where they had entered and into a large, black SUV.

After reviewing this footage, police canvassed the area and spoke to an individual who resided next door to Delsea Gardens at the Millville Motor Lodge. Based on the information provided by the witness, in addition to the information already gathered from the footage, police began to look for a large, black SUV, and specifically, a newer model SUV, possibly a Ford Expedition or a Chevy Suburban.

Shortly thereafter, an officer reported that he was pursuing a vehicle that matched that description—specifically, a black Ford Expedition that appeared to be a newer model. After confirming the vehicle being followed was a newer model, the officer was instructed by his superiors to pull the vehicle over. Two males were inside. Defendant was the driver, and Gross was the passenger. Having learned from Brooks that Gross was friends with Harris, police brought both men to the Millville police station for interviews, and the vehicle was

A-1006-23

impounded for further examination.

Defendant's interview was recorded and played for the jury. During his interview, defendant expressed concern about his vehicle. He explained that it was a rental vehicle, and he was the only one who operated it. He said that prior to being stopped, he was just driving around Vineland and Millville, drinking and smoking. He did not know what time he picked up Gross or how long the two of them were together. He acknowledged that he was at Delsea Gardens, and that he noticed the significant police presence.

Back at Delsea Gardens, police seized multiple .40 caliber Smith & Wesson casings and projectiles. They also observed and photographed a shoe print in blood. They did not find any fingerprints.

Police also searched the SUV and collected several items, including an Enterprise rental agreement, a black jacket, a latex glove, a cell phone, and defendant's license. The latex glove, which was discolored, was found on the passenger side of the vehicle in the front door pocket. Police also removed the SUV's infotainment center,[3] which included a navigation system.

---

[3] An infotainment center in a vehicle is a digital interface that combines information and entertainment functions. It typically includes features such as navigation, audio playback, communication, and smartphone integration, allowing drivers to access GPS directions, music, and phone calls easily through

A-1006-23

Both defendant and Gross were taken into custody, and police collected their clothing as well as Gross's phone, checking it for incoming and outgoing calls, text messages, and Wi-Fi network connections. Police discovered that at the time of the incident, Gross's phone had connected to Harris's Wi-Fi network.

Police also examined data collected from the infotainment system that was in the SUV. With this data, investigators were able to determine the route of the SUV around the time of the shooting. The navigation data indicated that the SUV turned into Delsea Gardens at 11:09 p.m. and left at 11:12 p.m. It then turned into the Millville Motor Lodge and departed at 11:21 p.m. From there, the SUV traveled to an apartment complex in Seabrook and arrived at 11:46 p.m. It then travelled to the Vineland Village Apartments, arriving at 12:16 a.m. It exited Vineland Village at 12:39 a.m., returned at 12:42 a.m., and then departed for a second time at 12:47 a.m. At 1:10 a.m., the SUV returned to Delsea Gardens. It left at 1:18 a.m., which was when police began to follow it.

Police also obtained defendant's and Gross's Facebook records, and investigators discovered messages between Gross and Lewis from shortly before the shooting. Specifically, around 7:00 p.m. on the evening of the incident,

---

a central display. Michell Erickson, What is the Infotainment System in a Car: Ultimate Guide, Car Awareness (July 21, 2025), https://carawareness.com/what-is-the-infotainment-system-in-a-car/.

A-1006-23

Gross said that he wanted Lewis to drink with him, stating, "I'm out here. You popping this bottle with me?" Lewis responded and told Gross to "pull up."

Police examined Lewis's public Facebook profile, and also obtained his phone number and his address, which was the same as defendant's. On his Facebook profile, investigators saw images of a sneaker collection which appeared to include Nike Foamposite sneakers. Later, investigators discovered this picture had been removed from Lewis's profile.

On December 5, 2019, police searched defendant's residence. Lewis was present, and investigators also found a certificate in a bedroom bearing Lewis's name, suggesting Lewis resided there. Police also found a press release relating to Harris's murder in the kitchen.

While at defendant's residence, investigators also spoke with Gerrell Black, who lived with defendant. She told investigators that defendant was her child's father. She also confirmed that Lewis, who was defendant's cousin, lived with her and defendant on occasion, and was living with them at the time of Harris's murder.

Meanwhile, several items that were found in the SUV were sent for further testing, including the jacket and latex glove. Both tested positive for blood. While no particular DNA profile could be determined from the sample taken

A-1006-23

from the jacket, a DNA profile was obtained from the latex glove. Only Lewis was a match.

Police also reviewed defendant's jail call logs from between November 7, 2019, and November 15, 2019, and discovered several calls placed to a phone number associated with Lewis.

On December 17, 2019, Lewis was arrested and charged along with defendant and Gross. At that time, his cell phone was seized and searched. Police discovered a web search related to DNA on latex gloves. Police also found a November 4, 2019, Facebook message from Lewis to defendant in which Lewis stated that he had a new "toy."

## B. Gross's Testimony

On February 19, 2020, Gross gave a formal cooperation interview to members of the prosecutor's office, after which he pled guilty to conspiracy to commit murder. Gross also testified at defendant and Lewis's joint trial. Gross testified that he and Harris had known each other since they were kids and had been "best friends." Gross would visit Harris at his apartment, and when he did so, he would connect to his Wi-Fi.

Gross admitted that he and Harris were involved in criminal activity together, and that in 2018, they broke into the home of a friend of theirs,

9

"Chuck," and stole "almost a hundred thousand dollars."  Gross believed that Chuck knew he and Harris had stolen from him.

Gross was also friends with Lewis, as the two "grew up together," but prior to the night of Harris's murder, Gross did not know defendant.  Gross confirmed that around the time of the incident, Lewis, who had previously been living with his girlfriend, was staying with defendant because he and his girlfriend were arguing.

On the day of the murder, Gross bought a bottle of liquor to celebrate a family friend's release from prison, but that family friend was in Delaware, so Gross contacted Lewis instead.  He then went to defendant's house to meet with Lewis.  Defendant was there as well, and Gross testified that was the first time he met defendant.  Gross further testified that when he entered the house, there were two guns on the kitchen table.  As the three were drinking, defendant made a comment indicating he was aware that Gross had stolen money from Chuck.[4]  That statement gave Gross pause, because he had never met defendant before and was unsure how he knew about the theft of Chuck's money.  Gross had also heard that Chuck had a bounty out on him and Harris.

---

[4] Specifically, Gross testified that Coombs referred to Gross as "the one that hit the lick," meaning the one that "robbed somebody or came up on some money or whatever."

A-1006-23

Gross stepped outside to think about how to leave, and defendant and Lewis followed him outside. Lewis pointed a gun at Gross, and defendant told Gross to do whatever Lewis said. Lewis then told Gross to get in defendant's vehicle, which was a big, black, newer SUV.

Gross testified that defendant then drove himself, Gross, and Lewis to Gross's house. Gross was instructed to go inside and change his shoes, which were brightly colored, and he was told that if he continued to do as they said, he would be okay. Gross then went inside, changed into green Nike Foamposite sneakers, and grabbed clear gloves and drugs that he had stashed. In the SUV, there was a conversation about what was going to happen next: the plan was for Gross to knock on the door to Harris's house, Lewis to "handl[e] his business," and defendant to stay in the vehicle and be the driver. At the time, Gross believed Lewis and defendant intended to rob Harris, and he was unable to remember at what point he realized the plan was to shoot Harris.

After leaving his house, Gross, Lewis, and defendant drove to the motel that was next door to Delsea Gardens. Gross then explained to defendant and Lewis where exactly in the Delsea Gardens apartment complex Harris lived. Gross and Lewis then got out of the vehicle and walked from the motel to Delsea Gardens through a hole in the fence that separated the two properties. The two

A-1006-23

went up to Harris's apartment and knocked on the door while defendant remained in the SUV. At trial, Gross was shown the surveillance footage and identified himself and Lewis at Harris's door. Gross testified that Lewis wore purple Nike Foamposite sneakers and a black hooded sweatshirt, and that Lewis also had on latex gloves and was holding one of the guns that Gross had seen earlier at defendant's house.

After knocking on the door, Gross walked away, as Harris's house was dark and he did not think that anyone was home. No one answered the door, and Gross and Lewis returned to the SUV.

Gross, Lewis, and defendant then drove around the area for some time, and Gross assumed that Lewis and defendant were looking for Chuck. Eventually, they returned to the motel next to Delsea Gardens. Like before, defendant stayed in the SUV and Gross and Lewis got out and walked over to Harris's apartment, passing through the hole in the fence. Gross knocked on Harris's door, and believing no one was home, turned and walked away. At that moment, Gross heard gunshots. He thought Lewis shot at the closed door, as he did not see it open or see anyone else there. Gross said he heard "a lot" of shots and did not hear any return fire. Gross and Lewis ran back through the hole in the fence and into the SUV, where defendant was waiting.

A-1006-23

The three men drove back to defendant's house to drop Lewis off. According to Gross, during the drive, Lewis and defendant discussed their plan to split a $50,000 bounty, and Lewis confirmed that Harris was dead.

Before getting out of the SUV, Lewis took off the latex gloves and left them in the car. Defendant ordered Gross to stay in the SUV and told Gross that he would take him home. After they arrived at his house, Gross went inside to change, but he insisted to defendant that he needed to go back to Delsea Gardens and check on Harris. Defendant drove Gross back to Delsea Gardens, which Gross believed he agreed to do because he wanted to watch Gross and make sure he did not speak to police.

When they entered Delsea Gardens, they saw a substantial police presence, and defendant immediately exited the apartment complex. As they left, they noticed a police car following them. Shortly thereafter, they were pulled over and Gross was arrested. Gross testified that defendant told him not to say anything to the police. Gross complied because he was afraid that Lewis would harm his family if he cooperated with police.

### C. Indictment, Conviction, and Sentencing

On January 29, 2020, defendant, Lewis, and Gross were charged by indictment with knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(1) and (2)

13

(count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count three); and second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count four). Lewis was also charged with several additional counts.

Defendant filed a pretrial motion to suppress evidence acquired as a result of the motor vehicle stop. On September 21, 2021, following a testimonial hearing, the court denied defendant's motion to suppress, rendering an oral opinion accompanied by a written order.

Defendant and Lewis were tried before a jury over the course of twenty-two non-consecutive days between January and March 2023. On March 10, 2023, the jury found defendant guilty of count two, conspiracy to commit murder. Defendant was acquitted of the remaining charges.

Sentencing took place on September 11, 2023. After determining defendant was extended-term eligible pursuant to the persistent offender statute, N.J.S.A. 2C:44-3(a), the trial court sentenced him to a thirty-six-year term of imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

This appeal followed. Defendant raises the following contentions for our consideration:

POINT I

THE JURY INSTRUCTIONS ON CONSPIRACY TO MURDER FAILED TO RESTRICT SUCH A CONSPIRACY TO A PURPOSEFUL AGREEMENT TO KILL, BUT, RATHER, EXPANDED IT TO INCLUDE AGREEMENTS IN WHICH ONE OR MORE OF THE PARTICPANTS MERELY KNEW THAT DEATH COULD RESULT BUT DID NOT PURPOSELY INTEND IT, OR EVEN AGREEMENTS IN WHICH ONLY SERIOUS INJURY (OR LESS) WAS INTENDED BY DEFENDANT, BUT THE VICTIM HAPPENED TO DIE.

POINT II

THE MOTION TO SUPPRESS SHOULD HAVE BEEN GRANTED FOR TWO REASONS: (1) THE STOP OF THE DEFENDANT'S RENTAL VEHICLE WAS MADE WITH ONLY A "HUNCH" THAT IT HAD BEEN INVOLVED IN A CRIME, RATHER THAN THE REASONABLE SUSPICION THAT THE CONSTITUTION REQUIRES, AND (2) THE ENSUING DETENTION OF DEFENDANT WENT FAR BEYOND A MERE "STOP"—IN TERMS OF LOCATION AND TIME—AND THEREBY BECAME A FULL-BLOWN ARREST WITHOUT PROBABLE CAUSE.

POINT III

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE AND UNCONSTITUTIONAL.

15

Defendant raises the following additional contention in his supplemental self-represented brief:

POINT IV

THE SUPREME COURT DECISION IN STATE V. HANNAH[5] MAKES IT CLEAR THAT WHEN THE STATE OFFERS GEOLOCATION EVIDENCE WITHOUT EXPERT TESTIMONY TO DEMONSTRATE ITS SCIENTIFIC BASIS AND RELIABILITY, THAT EVIDENCE SHOULD BE RULED INADMISSIBLE.

II.

We first address defendant's argument regarding the jury instructions on conspiracy to commit murder. Defendant contends for the first time on appeal `that those instructions—which followed the model jury charge—"failed to restrict such a conspiracy to a purposeful agreement to kill," and instead, expanded it to include agreements in which one or more of the participants "merely knew that death could result but did not purposely intend it" or "agreements in which only serious injury (or less) was intended by defendant, but the victim happened to die." Defendant contends his conspiracy conviction must be reversed because the instruction "allowed the jury to convict for levels of criminal intent that fall well short of what is necessary to convict for

---

[5]  263 N.J. 411 (2026).

conspiracy to murder." Defendant further maintains that this alleged error led to "inconsistent" verdicts warranting entry of a judgment of acquittal. We are unpersuaded by defendant's arguments.

A.

Because defendant did not object to the conspiracy charge that was given, we review defendant's contention for plain error. R. 2:10-2. Under that standard, a reviewing court must "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Bragg, 260 N.J. 387, 404 (2025) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). Reversal is required only in those instances where the error was "sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting Funderburg, 225 N.J. at 79).

Here, the court instructed the jury on conspiracy to commit murder in accordance with the model jury charge. Model Jury Charges (Criminal), "Conspiracy (N.J.S.A. 2C:5-2)" (rev. Apr. 12, 2010). It bears emphasis that a jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is "comprehensive and thorough." State v. R.B., 183 N.J. 308, 325 (2005); see also State v. Whitaker,

402 N.J. Super. 495, 513-14 (App. Div. 2008) (explaining that "[w]hen a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered'" (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000))); cf. Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000) ("It is difficult to find that a charge that follows the Model Charge so closely constitutes plain error.").

Here, the court charged the jury as follows:

> The indictment charges the defendant with the crime of conspiracy to commit murder and reads as follows. On or about the 6th day of November, 2019 in the City of Millville, County of Cumberland, aforesaid and within the jurisdiction of this court, [defendant] and Cleve Lewis purposefully or knowingly did conspire to commit the offense criminal homicide contrary to provisions of 2C:5-2 and [2C:11-3(a)] . . . .

> [A] person is guilty of -- conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he, one, agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

> A conspiracy to commit the crime of murder is a crime in itself separate and distinct from the crime of murder. . . . In other words, a defendant may be found guilty of the crime of conspiracy regardless of whether

18

that defendant is guilty or not guilty of the crime of murder.

In order for you to find a defendant guilty of the crime of conspiracy, the State must prove beyond a reasonable doubt the following elements. Number one, that the defendant agreed with another person or persons that they or one or more of them would engage in conduct which constitutes a crime or -- or an attempt or solicitation to commit such crime; or the defendant agreed to aid another person or persons in the planning or commission of a crime or of an attempt or solicitation to commit such crime. And, two, that the defendant's purpose was to promote or facilitate the commission of the crime of murder as I've already previously defined this charge.

. . . .

[T]o decide whether the State has proven the crime of conspiracy you must understand what constitutes the crime of murder, as I've already defined it for you previously.

. . . .

You have to decide whether the defendant's purpose was that he or a person with whom he was conspiring would commit the crime of murder. For him to be found guilty of conspiracy, the State has to prove beyond a reasonable doubt that when he agreed it was his conscious object or purpose to promote or make it easier to commit murder, as I previously instructed you.

Despite the fact that these instructions used the precise language in the model jury charge (which, in turn, quotes the conspiracy statute, N.J.S.A. 2C:5-

19

2(a), verbatim), defendant maintains that they were defective, essentially arguing that conspiracy to murder requires the same mental state as attempted murder. Defendant is mistaken as a matter of law. While both attempt and conspiracy require a purposeful state of mind, the objects of that purpose are different. Specifically, the attempt statute provides, in relevant part, that "[w]hen causing a particular result is an element of the [predicate] crime," a person is guilty of attempt if the person "does or omits to do anything with the purpose <u>of causing such result</u> without further conduct on his part." <u>State v. Rhett</u>, 127 N.J. 3, 6 (1992) (emphasis added) (quoting N.J.S.A. 2C:5-1(a)(2)). As a result, an "actor is guilty of attempted murder only if [they] actually intended the result, namely, death, to occur." <u>Id.</u> at 7.

Conspiracy, on the other hand, does not require a purpose to cause the particular result of the predicate crime. Instead, the conspiracy statute provides:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose <u>of promoting or facilitating its commission</u> he:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

[N.J.S.A. 2C:5-2(a) (emphasis added).]

In other words, the purposeful nature of the offense of conspiracy applies to the <u>agreement</u> to "promot[e] or facilitate[e]" the crime, not to the result of that crime. <u>See</u> <u>State v. Samuels</u>, 189 N.J. 236, 245 (2007) ("As the language of the statute reveals, the agreement to commit a specific crime is at the heart of a conspiracy charge."). Accordingly, contrary to defendant's newly minted contention, the conspiracy count does not require an agreement to commit purposeful murder; rather, it includes an agreement to commit murder as that offense is defined, i.e., knowing <u>or</u> purposeful. N.J.S.A. 2C:11-3(a)(1)-(2).

Defendant cites several cases he claims stand for the proposition that "[a] conspiracy to murder is an agreement only to purposely kill." Those cases, however, do not support that proposition. <u>See, e.g.</u>, <u>State v. Abrams</u>, 256 N.J. Super. 390, 401 (App. Div. 1992) (reversing conspiracy conviction not based on purpose requirement but because alleged co-conspirator's acts "never rose to the level of an agreement"); <u>State v. Madden</u>, 61 N.J. 377, 394-95 (1972) (finding a conspiracy charge inappropriate because there was no evidence of an "actual agreement"). Defendant also cites <u>State v. Fornino</u>, in which we upheld a conviction for conspiracy to murder where the trial record contained sufficient evidence that the defendant "intended to kill" the victims. 223 N.J. Super. 531,

21

536 (App. Div. 1988). But <u>Fornino</u> did not address defendant's contention that <u>only</u> such a purpose can satisfy the conspiracy to murder charge. For these reasons, we decline to part with precedent and hold that the model jury instruction for conspiracy is erroneous as applied to a conspiracy to commit a knowing or purposeful murder.

B.

We likewise reject defendant's closely related argument that the jury's "inconsistent" verdicts resulted from the same alleged jury instruction error. As we have noted, the jury found Lewis guilty of Harris's murder and defendant guilty of conspiring with Lewis to murder Harris. Although those verdicts necessarily made defendant vicariously responsible for Harris's death, N.J.S.A. 2C:2-6(b)(4), the jury found defendant not guilty of Harris's murder.[6] It is well established, however, that "[w]e accept inconsistent verdicts in our criminal justice system, understanding that jury verdicts may result from lenity, compromise, or even mistake." <u>State v. Goodwin</u>, 224 N.J. 102, 116 (2016). Notwithstanding that clear precedent, defendant relies on <u>State v. Grey</u>, 147 N.J. 4, 15-18 (1996), for the proposition that he is entitled not just to a reversal and

---

[6] The State appears to concede that the verdicts were inconsistent, acknowledging in its response brief that "vicarious liability applies" and "the jury fail[ed] to understand vicarious liability."

22

remand for retrial, but to an entry of a judgment of acquittal. We disagree, as defendant's reliance on Grey is misplaced given the unique circumstances of that case.

In Grey, the defendant was convicted of second-degree conspiracy to commit aggravated arson and three counts of felony murder. Id. at 8. The defendant was acquitted, however, of knowing/purposeful murder, second-degree aggravated arson, and third-degree terroristic threats. Ibid. On appeal, the defendant argued for reversal of the felony murder verdicts because they were inconsistent, as defendant was acquitted of the predicate felony of aggravated arson. Id. at 8-9. Ultimately, the Court found that "unusual circumstances in the sequence and delivery of the instructions to the jury led the jury to predicate its conviction of felony murder on its conviction of conspiracy to commit aggravated arson." Ibid. Because a conviction of felony murder "is not permitted on that basis," the Court reversed the defendant's felony murder convictions. Id. at 5, 17.

In arriving at its decision, the Grey Court emphasized that as a "general rule," inconsistent verdicts are accepted. Id. at 11. In cases where the reason for the inconsistent verdicts cannot be determined, a reviewing court "should not speculate" as to the cause of the inconsistency and instead uphold the

verdicts. Ibid. In Grey, however, "[t]he problem . . . [was] that there [was] virtually no 'uncertainty,'" as "[t]he reason for the verdict appear[ed] [in] the record." Id. at 12. The Court found that the "charging sequence undoubtedly led the jury to acquit defendant of the underlying predicate to a felony murder[7] conviction." Id. at 14. The Court emphasized:

> This . . . is an idiosyncratic case. . . . It is a case in which the inconsistency in the verdicts is undoubtedly due to the jury's erroneous belief that it could convict defendant of felony murder based on the conspiracy count. Although the jury might well have convicted the defendant of aggravated arson as an accomplice, it did not do so for reasons acknowledged by the prosecution to be related to the sequence of the charge and recharge on aggravated arson. This problem will most likely never arise again.
>
> . . . .
>
> To sum up, this case is not about speculation as to the reasons for the inconsistent verdict but, rather, about a misleading charge that led to a verdict not permitted under our law. . . .
>
> . . . The unusual sequence in the charge on aggravated arson explains why the jury did not convict

---

[7] Felony murder occurs when a death is caused in the course of committing one of the predicate felonies enumerated in N.J.S.A. 2C:11-3(a)(3). It requires the State to prove beyond a reasonable doubt that the defendant committed the predicate felony. See Grey, 147 N.J. at 16 (noting that "juries . . . may not convict a defendant of felony murder unless they convict the defendant of the underlying [predicate] offense").

A-1006-23

defendant as an accomplice to aggravated arson. The conviction of conspiracy to commit aggravated arson may not serve as the predicate to a felony-murder conviction.

[Id. at 16-17 (emphasis added).]

Defendant maintains that, as in Grey, the inconsistency in the verdicts can be explained by the court's instructions, specifically its "overbroadening the definition of the crime of conspiracy to commit murder." But here, there was no misleading charge that led to a verdict not permitted under the law. Contrary to defendant's argument, the court's jury instruction was correct, as we have explained. Stated another way, the so-called "inconsistency" in this case does not appear to have been caused by the court's instructions—let alone "undoubtedly" so, Grey, 147 N.J. at 16—as the court specifically told the jury, "[I]f you find beyond a reasonable doubt that Cleve Lewis . . . committed the crime of murder, and also that . . . defendant conspired with Cleve Lewis . . . to commit that crime, then you must find . . . defendant guilty of the crime of murder."

In reaching this conclusion, we adhere to the strict admonition that reviewing courts must "resist the temptation to speculate on how the jury arrived at the verdict." Goodwin, 224 N.J. at 116. The only inquiry is "whether the evidence in the record was sufficient to support a conviction on any count on

which the jury found the defendant guilty." Ibid. (quoting State v. Muhammad, 182 N.J. 551, 578 (2005)). In this case, there was sufficient, indeed, overwhelming evidence to support the prosecution's theory that defendant made an agreement with others to commit a planned murder. Accordingly, we conclude that there was no error in the court's instructions warranting appellate intervention.

## III.

We next address defendant's search-and-seizure contention. Defendant argues that the motion to suppress evidence collected following his motor vehicle stop should have been granted because (1) the stop of his vehicle was made without reasonable suspicion and (2) the ensuing encounter exceeded the boundaries of a lawful investigative detention, transforming the investigatory stop into a "full-blown arrest" for which the police lacked probable cause. We are unpersuaded and affirm the denial of the motion to suppress.

## A.

We briefly summarize the relevant facts elicited at the suppression hearing, at which several Millville Police Department officers testified.

Officers arrived at Delsea Gardens at approximately 12:30 a.m. and were able to review surveillance footage from the complex while still on scene via

26

their mobile devices.  The footage showed two subjects, one wearing a jacket with a reflective stripe, entering Delsea Gardens through a fence on the north side of the property and walking to Harris's unit.  One of the subjects then opened fire.

After reviewing this footage, police canvassed the area, and Detective Miguel Martinez spoke to a witness who resided next door to Delsea Gardens at the Millville Motor Lodge.  The witness told Martinez that he observed a "huge," dark-colored, "newer model" SUV make three separate visits to Delsea Gardens that evening.  Each time, several individuals exited the SUV, walked toward the apartment complex, and then returned to the SUV, which left the parking lot.  The witness told Martinez that this happened around 8:00 p.m., again around 9:00 p.m., and a third time around 11:20 p.m.  Martinez relayed this information to other officers.

Sergeant Brandon Kavanagh arrived at Delsea Gardens about one hour after the shooting.  While there, he learned of the large, dark-colored SUV that was seen earlier that evening.  At 1:18 a.m., Kavanagh saw a vehicle matching that description leave Delsea Gardens.  Kavanagh followed the vehicle, a new Ford Expedition, based "on a hunch" that it may have been involved in the shooting.  There were not many other vehicles on the road at that time.

27

Kavanagh followed the vehicle to a nearby bar and parked across the street to observe. He saw the front seat passenger get out of the vehicle and walk into the bar. After a few minutes, the passenger walked out of the bar and back into the vehicle. The vehicle then pulled out of the parking lot of the bar and continued down the road.

As he followed, Kavanagh received an update from Lieutenant George Chopek, who informed Kavanagh that the suspect vehicle was "a large black SUV, somewhat shiny, Ford Expedition or Chevy Suburban style." Kavanagh immediately reported back that he was following a vehicle that matched that description, and at approximately 1:30 a.m., at Chopek's direction, he initiated a motor vehicle stop. When asked by the prosecutor why he stopped the vehicle, Kavanagh testified that he initially followed it because it was a "large dark colored SUV," and then "after I talked to Lieutenant Chopek and he informed me that it was shiny, or somewhat clean SUV, we determined that maybe I should stop it and find out who the occupants were inside of it."

After both vehicles pulled to the side of the road, the passenger got out and walked into the middle of the street. Kavanagh instructed him to get back in the vehicle. The passenger complied. There were two people inside the vehicle; defendant was the driver and Gross was the passenger. Kavanagh ran

28

A-1006-23

warrant checks on both individuals: Gross had at least one active warrant and was arrested. Defendant had no active warrants.

Chopek arrived at the scene and reviewed additional surveillance footage, which showed a black SUV entering and leaving Delsea Gardens around the time of the shooting. Chopek testified that "it was pretty clear" this was defendant's vehicle. Additionally, Chopek observed latex gloves in the SUV's passenger door compartment. The SUV was towed and impounded.

At the police station, Detective Ricardo Ramos interviewed Harris's girlfriend, Shante Brooks, who told Ramos that Gross and Harris were "best friends." Ramos learned that Gross was one of the occupants of the vehicle officers had stopped, and he relayed Brooks's statement to officers on scene.

At approximately 2:30 a.m., police took defendant, who was not handcuffed, to the police station for further questioning. Ramos conducted the interview and testified that defendant was initially cooperative and signed a Miranda[8] form at 3:56 a.m. Defendant told Ramos that he was smoking, drinking, and driving around all day prior to being stopped. He also told Ramos that the car was a rental. Finally, he stated that he and Gross had been at Delsea Gardens visiting "this dude." At that point in the interview, defendant said that

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1006-23

he "d[idn't] want to answer [any] more questions," and Ramos terminated the interview.

Following testimony, the court heard arguments from all parties. Notably, defendant's counsel conceded that there was reasonable suspicion to stop the vehicle but took issue with defendant's being taken to the police station for further questioning.

The court issued an oral opinion, which was later accompanied by a written order. The court held:

> The stop of the vehicle, the decision made by Lt. Chopek to make an investigative stop of that vehicle was reasonable.
>
> That was a reasonable decision predicated upon the information available to law enforcement at the time. They had a description of the vehicle. And some of the factors here, the description of the Delsea Gardens Apartments is a high-crime area. The time in which this vehicle was leaving is after 1 o'clock in the morning. So it's not mid-day. This . . . vehicle was being operated at a time of night in a high-crime area, matching the description of a vehicle that was associated with a homicide earlier that evening, an hour or so prior. It was absolutely appropriate that that vehicle be stopped at that point in time. It would have been a dereliction of their duty as investigators of this offense to allow that vehicle to leave uninvestigated. It is simply -- there are too many factors that would require police investigation of that vehicle.

30

The court also found that the decision to bring defendant back to the station for an interview did not amount to an arrest. Instead, the court found that it was a "rapidly evolving situation" that warranted defendant's investigative detention. The court concluded:

> The question ultimately is, was law enforcement acting reasonably given the circumstances here. And the totality of the circumstances here is, it was entirely appropriate. Stopping the vehicle was almost a must. They had to stop that vehicle to find out what was going on. [There were] too many associations to the limited information they had at the time to allow that vehicle to leave.
>
> Once the passenger in the vehicle was taken into custody due to the outstanding warrant and the decision was made to impound the vehicle, I disagree with [defense counsel], leaving [defendant] standing on the side of the road is not appropriate. He needed to be questioned. They needed to speak to him. Questioning him on the side of the road impaired their ability to record the statement and did not give a more formal interview, which was what they were looking for, which was appropriate [and] reasonable.

## B.

We first address defendant's contention that the police lacked reasonable suspicion required to stop his vehicle—notwithstanding that defense counsel explicitly conceded that point at the suppression hearing. Defendant now argues that the hearing testimony supports the notion that he was stopped based on a

31

"hunch," and a "'hunch' is not good enough."

In determining whether the trial court erred in its suppression ruling, we must "defer[] to the trial court's factual findings" and uphold them so long as they are supported by "sufficient credible evidence in the record." State v. Nelson, 237 N.J. 540, 551 (2019) (quoting In the Int. of J.A., 233 N.J. 432, 445 (2018)). "[A] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction." State v. Robinson, 200 N.J. 1, 15 (2009) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). In contrast, we review the trial court's interpretation of the law and the legal "consequences that flow from established facts" de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

"A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532 (2017). "To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'" State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40, modified on other grounds, 174 N.J. 351 (2002)).

A-1006-23

In determining whether an investigative detention is justified under the reasonable suspicion standard, "a court must consider 'the totality of the circumstances—the whole picture.'" State v. Stovall, 170 N.J. 346, 361 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Furthermore, reasonable suspicion "requires 'some minimal level of objective justification for making the stop.'" State v. Amelio, 197 N.J. 207, 211-12 (2008) (quoting State v. Nishina, 175 N.J. 502, 511 (2003)); see also State v. Scriven, 226 N.J. 20, 34 (2016) ("[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop."). "Although a mere hunch does not create reasonable suspicion, the level of suspicion required is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Gamble, 218 N.J. at 428 (internal quotation marks and citations omitted).

Additionally, reasonable suspicion analysis considers "the officers' background and training, and permits them 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" Nelson, 237 N.J. at 555 (additional internal quotation marks omitted) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)); see also Stovall,

A-1006-23

170 N.J. at 363 ("It is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers.").

"Although reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" State v. Nyema, 249 N.J. 509, 527 (2022) (alteration in original) (quoting Stovall, 170 N.J. at 372 (Coleman, J., concurring in part and dissenting in part)).

"Determining whether reasonable and articulable suspicion exists . . . is a highly fact-intensive inquiry that demands evaluation of 'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" Id. at 528 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)).

Here, as defense counsel conceded before the trial court, the police had reasonable, articulable suspicion to stop defendant's vehicle. The SUV matched a specific description—a large, black, new/shiny Ford Expedition or Chevy Suburban—which was based on the credible testimony of the witness who

A-1006-23

observed the vehicle three separate times that evening. Kavanagh observed the vehicle driving near the scene of the incident—a high-crime area—at 1:18 a.m., when few other cars were on the road. Finally, Kavanagh observed Gross exit the passenger seat at the bar, and the officers knew that they were looking for more than one suspect based on surveillance footage and the witness's testimony. Importantly, Kavanagh was not the only officer who made the decision to stop the vehicle.

Although Kavanagh used the term "hunch," that referred to the initial decision to follow the vehicle. It is well established that reasonable suspicion is not needed to follow a vehicle. See Michigan v. Chesternut, 486 U.S. 567, 575 (1988) (holding that police do not seize a suspect by merely following them without activating their siren/lights or otherwise directing the suspect to stop); State in Int. of C.B., 315 N.J. Super. 567, 572 (App. Div. 1998) ("[P]olice do not effectuate a [Fourth Amendment] stop simply by . . . following a person in a police vehicle." (citations omitted)). Rather, the reasonable suspicion requirement arises at the moment that police communicate to the driver of the subject vehicle to pull over. The record clearly demonstrates that by the time the decision was made to initiate a stop, police had reasonable suspicion to believe the vehicle was involved in criminal activity based not only on

Kavanagh's own observations, but information communicated to him by other officers investigating the recent murder.

C.

We next address defendant's contention that when he was transported to the station for interrogation, the vehicle stop "became an arrest conducted without probable cause" and "that suppression of its fruits should have been ordered for that reason too." Although we agree with defendant that the investigative detention was unduly protracted, we are satisfied that in these circumstances, the "fruit" of the unlawful arrest—a statement defendant gave to police[9]—is not subject to the exclusionary rule. Here, defendant's post-<u>Miranda</u>, voluntary statement to police was sufficiently attenuated from his arrest. Furthermore, the admission of his electronically recorded statement at trial was in any event harmless beyond a reasonable doubt given the overwhelming and independent evidence of guilt presented to the jury.

An investigative stop "must be limited in time and scope to the purpose that justified the stop in the first place." <u>State v. Gibson</u>, 218 N.J. 277, 291 (2014) (citing <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983)). "[A]n investigative

---

[9] While not relevant to this appeal, the trial court suppressed part of defendant's statement based on his invocation of his <u>Miranda</u> rights.

stop becomes a de facto arrest 'when the officers' conduct is more intrusive than necessary for an investigative stop.'" State v. Dickey, 152 N.J. 468, 478 (1998) (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)).  Factors relevant to determining if an investigative stop has become a de facto arrest include:  the duration of the stop, if it involves unnecessary delay; "the degree of fear and humiliation that the police conduct engenders;" "transporting a suspect to another location or isolating him from others;" and "subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car." Id. at 479 (quoting United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994)); see also State v. Shaw, 237 N.J. 588, 612-13 (2019) (listing the same factors).

"Case law has recognized law enforcement's need to respond to the fluidity of a street encounter where there is a reasonable suspicion of wrongdoing; accordingly, the duration of the investigative stop may be extended for a reasonable but limited period for investigative purposes." State v. Coles, 218 N.J. 322, 343-44 (2014).  "In assessing whether a detention is too long in duration to be justified as an investigative stop, [courts] . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to

A-1006-23

continue to detain the defendant." Dickey, 152 N.J. at 477 (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)). Further, to avoid becoming a de facto arrest, the "detention must be reasonable both at its inception and throughout its entire execution." Shaw, 237 N.J. at 612 (quoting Coles, 218 N.J. at 344). "Once a de facto arrest occurs, the particularized suspicion that originally supported the investigatory detention is no longer sufficient and the arrest must be supported by probable cause." Coles, 218 N.J. at 346.

Our Supreme Court has determined as "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." Dickey, 152 N.J. at 476-77 (quoting Sharpe, 470 U.S. at 685). Furthermore, the U.S. Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Sharpe, 470 U.S. at 685.

In this instance, we are not convinced that the extended delay occasioned by the police transporting defendant to the station for further questioning stayed within the boundaries of an investigative detention. At some point, the detention became tantamount to an arrest for Fourth Amendment purposes. However, the fruit of the resultant arrest was sufficiently attenuated from that detention such

38

that suppression is not required. "[T]he exclusionary rule will not apply when the connection between the unconstitutional police action and the evidence becomes so attenuated as to dissipate the taint from the unlawful conduct." State v. Williams, 192 N.J. 1, 15 (2007) (quoting State v. Badessa, 185 N.J. 303, 311 (2005)). While the "general rule" is that "a confession obtained through custodial interrogation after an illegal arrest should be excluded," courts will decline to exclude a confession that was "sufficiently an act of free will" to "purge the primary taint" of the illegal arrest. Shaw, 237 N.J. at 614 (internal quotation marks and citations omitted). Stated another way, we must "separate[] confessions which resulted from an exploitation of an illegal arrest from those which were the product of the defendant's free will, the taint of the illegal arrest having been sufficiently attenuated." Ibid. (quoting State v. Barry, 86 N.J 80, 87 (1981)). We conclude that defendant's statement was sufficiently attenuated from his detention such that exclusion was not required. We emphasize that defendant was Mirandized before making any statements to police and eventually invoked his right to remain silent.

Furthermore, we are satisfied that even assuming for the sake of argument that defendant's statement to police should have been suppressed as a fruit of an unlawfully protracted investigative detention, the error in admitting that

statement was harmless beyond a reasonable doubt. It is well-settled that "'most constitutional errors can be harmless,' and are therefore not subject to automatic reversal." State v. Camacho, 218 N.J. 533, 547 (2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991)); see also State v. Carlton, 262 N.J. 629, 642 (2026) ("Federal constitutional errors are generally subject to harmless error review."). When a constitutional right is implicated, the harmless error analysis requires that the error be harmless beyond a reasonable doubt. See State v. Slaughter, 219 N.J. 104, 118-19 (2014) ("[W]here the trial court commits a constitutional error, that error is to be considered 'a fatal error, mandating a new trial, unless we are able to declare a belief that it was harmless beyond a reasonable doubt.'" (quoting State v. Cabbell, 207 N.J. 311, 338 (2011))). "When we consider whether a given error is harmless, that error 'must be evaluated in light of the overall strength of the State's case.'" State v. Allen, 254 N.J. 530, 550 (2023) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

In State v. Tillery, our Supreme Court noted that whether the defendant's Miranda waiver was voluntary presented a "close question," but ultimately concluded that any error in the trial court's admission of the statement was harmless beyond a reasonable doubt. 238 N.J. 293, 302 (2019). The Court explained that the statement was harmless because it was not capable of

A-1006-23

changing the outcome of the defendant's trial, considering the overwhelming, "independent" evidence of his guilt and that the admitted statement "contained little—if any—incriminating evidence." Id. at 319-22.

Conversely, the Court in State v. Wade concluded that case was not "an instance of overwhelming, direct evidence." 252 N.J. 209, 221 (2022). Rather, "[the] [d]efendant's statements identifying himself in the liquor store footage strengthened the State's theory of the case and the circumstantial evidence supporting it." Ibid. Noting that "the State's theory hinge[d] on circumstantial evidence of [the] defendant's location at a particular time," the Court concluded that the defendant's "self-identifying, self-inculpatory statement that color[ed] the defendant as a liar [wa]s not harmless beyond a reasonable doubt." Ibid.

Here, defendant admitted in his recorded statement that he and Gross visited someone at Delsea Gardens earlier that evening. While this admission indirectly incriminated defendant by placing him with Gross at the apartment complex where the shooting occurred, that fact—and defendant's broader participation in the crime—was independently established by other evidence at trial. Specifically: (1) Gross testified extensively to defendant's involvement in the planning and commission of the shooting, provided evidence of a motive for defendant's participation (recouping the bounty placed on Harris), and identified

defendant in surveillance footage; (2) that footage showed defendant's SUV entering Delsea Gardens around the time of the shooting and Lewis and Gross fleeing into defendant's SUV after shooting Harris; (3) the GPS data from the SUV's infotainment system confirmed defendant's presence at Delsea Gardens at those times, including the time of the shooting; (4) police found a press release relating to Harris's murder in defendant's kitchen; and (5) various communications between Lewis and defendant indicated that they had planned the shooting together. In these circumstances, we conclude that as in Tillery, even if defendant's stationhouse statement was erroneously admitted, it was harmless beyond a reasonable doubt given the overwhelming, independent evidence of his guilt presented at trial.

## IV.

We turn next to defendant's contention that the trial court improperly admitted geolocation evidence without expert testimony. We begin by noting that "a trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484, (1997)). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so

A-1006-23

wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Marrero, 148 N.J. at 484) (internal quotation marks and citations omitted).

## A.

In this case, the State proffered digital evidence obtained using three software technologies: Geotime, Cellebrite, and Graykey.

### Geotime

The Geotime evidence was presented over defense counsel's objection that the State needed to supply expert testimony regarding the scientific basis and reliability of the GPS-data collection device in the vehicle and the Geotime software that compiled it.

Investigator Thomas Chang of the New Jersey State Police testified that he received "GPS coordinates, latitude, longitudes, date and times" from Detective Calixto that had been extracted from the infotainment system of the rental SUV. Chang entered this GPS data into the Geotime software to create a map of the SUV's route from November 6, 2019, to November 7, 2019. During his testimony, Chang placed the SUV in various locations from Delsea Gardens to the surrounding area that generally matched the State's allegations regarding the location of the SUV.

A-1006-23

Prior to Chang's testimony, the trial court conducted a <u>Frye</u>[10] hearing on admissibility of the Geotime software he utilized. According to Chang's testimony at the hearing, the raw data extracted from the vehicle was provided to him on an Excel spreadsheet. Chang further explained, "[t]he software that I use works with coordinates and it maps everything . . . on a Google-style map, the geography map." Chang testified that he could have created the map manually using the same GPS coordinates, but that would have been more time consuming.

Chang testified that he had received two eight-hour trainings along with "[a]bout [fifteen] online courses" regarding the operation of the Geotime software. He could not attest to the reliability of the data, the manner in which it was collected, or the software. Chang was unaware of any peer-reviewed

---

[10] <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923). Codefendant Lewis argues that <u>State v. Olenowski</u>, 253 N.J. 133 (2023), was decided during the course of his trial and required that the trial court consider the <u>Daubert</u> factors in admitting testimony regarding Cellebrite. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). However, the <u>Olenowski</u> Court stated "[n]othing in today's decision disturbs prior rulings that were based on the <u>Frye</u> standard. Future challenges in criminal cases that address the admissibility of new types of evidence should be assessed under the new standard outlined above." 253 N.J. at 154. While this issue was not raised by defendant, we note that because <u>Olenowski</u> does not apply retroactively, we decline to reverse the trial court's decision with respect to the admissibility of evidence based on its use of the <u>Frye</u> standard.

A-1006-23

articles about the software he was using and had no knowledge of the system limitations of the devices involved or of scientific studies regarding their reliability.

Following the hearing, the trial court concluded that expert testimony was not needed to explain the Geotime software to the jury. The court explained,

> [W]hile it's impressive, this is not rocket science, okay? This is just about taking data and putting the points on a map. Whether they're accurate or not depends on the GPS technology which . . . I find is fundamentally reliable. And this is just recording that information on a map. As long as he operates it correctly, and he's been trained to do that, I do not find that that is the type of technology that the Court would require a great deal of explanation on because it's fairly basic.
>
> . . . .
>
> So GPS location technology is generally reliable. The manufacturer of the vehicle has an interest to make sure that the units they're using are . . . reasonably accurate, and the [Geotime] system . . . this individual has been properly trained to operate. And its ultimate function is not so complex that would require further examination by the Court. It's just plotting.

### Graykey and Cellebrite

The State also presented Detective Kyle MacDonald to testify as to his use of Graykey and Cellbrite to extract and interpret data from Lewis's phone. The trial court conducted another Frye hearing outside the presence of the jury

45

prior to MacDonald's testimony.  According to MacDonald, Graykey serves two functions:  (1) it guesses the password of the phone to be searched or bypasses the password, and (2) it copies the files on the phone onto a hard drive.  The copied files consist of incomprehensible letters and numbers, which Cellebrite transforms into a readable format.

MacDonald is a certified forensic computer examiner and has used Cellebrite for over nine years.  He testified that he has had the opportunity to verify the program's accuracy by checking its results against data on unlocked phones.  He testified that both Graykey and Cellebrite were commonly used and relied upon by police departments.

The trial court found that MacDonald's testimony regarding Graykey and Cellebrite was admissible, over defense counsel's objection.  With respect to Graykey the court explained,

> the Frye application with regard to Gray[k]ey is kind [of] counterintuitive.  How could the Court ever determine that you can't rely upon it if it gets you in the phone?  And it got him in the phone.  So how could I find that that is not reliable?  But the fact that law enforcement generally relies upon that particular device with regard to iPhones, it demonstrates to the [c]ourt that there is sufficient reliability with regard to that because they were able to open the phone ultimately, and open the entire phone.

A-1006-23

Turning to Cellebrite, the court made the following findings:

> But as far as Cellebrite, it is generally relied upon, particularly here in New Jersey, by law enforcement, and the state police use it.
>
> . . . .
>
> So generally speaking, the Cellebrite technology I find is reliable. It is independently verifiable by comparing the phone once you get access to the phone.
>
> . . . .
>
> But again, it is the type of technology that is generally relied upon by law enforcement as generally reliable. So from the standpoint of the [Frye] application, it would generate generally reliable or trustworthy results.

The trial court concluded that expert testimony was not required for either program, and further found that MacDonald was sufficiently trained in both to testify as a lay witness to what he observed when using those programs.

<u>Cell Tower Location Testimony</u>

Investigator Chang also testified to "call" and tower-location data provided from the use of Graykey and Cellebrite. The trial court held a <u>Rule</u> 104 hearing outside the presence of the jury to determine the admissibility of this testimony. Defense counsel did not raise any objections to this testimony following the hearing; however, the court expressed the following concerns:

THE COURT: Is this the proper witness to be giving testimony about cell tower data? Has he been qualified as an expert?

[THE PROSECUTOR]: No, Your Honor.

THE COURT: All he can say is he got this data and he plugged it into the program. That's okay. But what that data means, that's something completely different, isn't it? This is exactly what I was talking about a few minutes ago. This is different than doing a data dump out of a cellphone and taking its reported coordinates just like the infotainment system.

. . . .

THE COURT: This witness is trying to give, or is attempting to give expert testimony without being qualified as an expert when it comes to cell tower location technology. Cell tower location technology is different. We're talking about . . . not quadrants, sectors, three sectors. Now, I've heard this testimony more than once before. I think I have a fairly good understanding of how it works. But I have heard nothing to indicate that this individual should be considered an expert in the generation of the data. He may be able to interpret the data through his system. That's fine. But the data itself and the admissibility of the data is the other question. Now, I do know through previous experiences here that particularly down in this area there are a couple of cell towers that have a couple issues with regard to distances, okay? And so far what I've heard from him is accurate, but he's simply not qualified as an expert to give that kind of testimony, and that's my problem.

A-1006-23

The court concluded that Chang's testimony should be limited to tower location, explaining,

> at best what he can do, and I don't know what he's plotted in his report, he can indicate what cell tower the data says it hit off of and where the cell tower is located. But as for the exact location of the phone, without an actual expert testifying about . . . how they could figure out where that is, [I am] not going to permit that.

At trial, co-defendant Lewis presented his mother, Loretta Lee, as his alibi witness for the night of the shooting. Lee claimed she was with Lewis at his home that night, and arrived at approximately 10:20 p.m. Accordingly, defense counsel for Lewis requested that the trial court allow cross-examination regarding the distance between certain addresses to bolster Lewis's alibi. Defense counsel stated, "[t]he report also alludes to distances from one point to another. Can he be cross examined with regard to distances?" The trial court permitted the requested cross-examination.

Chang testified before the jury as follows:

> Q    Did you receive data about calls and when they took place?
>
> A    Yes, I did.
>
> Q    And what was the date and time range for this data?

A     The data provided was from 9:19 [p.m.] through 9:44 [p.m.], November 6, 2019.

Q     And who was the phone carrier?

A     T-Mobile.

Q     And what was your methodology for your analysis, sir?

A     It was . . . to provide a visual display of the call events where -- where in the State of New Jersey the . . . phone calls are connected with . . . cellular antennas.

Q     Okay.  And were you able to locate a location for the tower?

A     Yes.

Q     And where was the location of the tower generally?  In what town or area?

A     . . . Fairfield Township.

          . . . .

Q     Okay.  If you look on page [twelve], it indicated that there was another call that took place later.  Just looking for the time of that call.

A     Okay.  So . . . that last call that I did -- that I did mention at 9:44 and [twenty-eight] seconds [p.m.] . . . that call lasted [sixteen] minutes and [forty] seconds. With that it would have ended at 10:01 [p.m.]

Q     And was there an address that you were interested in comparing that phone number to?

A-1006-23

A     As far as the location of –

Q     Yes, sir.

A     Where this phone -- where the –

Q     The tower was.

A     It was along Fairton-Gouldtown Road.

Q     So the tower was located at Fairton –

A     Yes, and if I remember working in this area that was right at the Fairfield Township municipal building. So . . . right behind it was the cell tower.

Q     And did you compare the location of the tower to another address?

A     Yes, to the one that was in Upper Deerfield Township, Seabrook.

Q     And what was the address for this, sir?

A     That was First Avenue.  1107 First Avenue, Seabrook, New Jersey.

Q     And would you happen to know, in miles, how far they are?

A     Not . . . off hand.  Not . . . an exact mile.

Q     Was it something that you noted in your report?

A     [I] have a time.  On page six of my report I have a line of sight distance and that's 7.5 miles.

51

A-1006-23

Q     And if you were driving do you have a rest of the distance from driving?

A     Yes, I do.  Depending on the route you took, I showed three of them. . . .  [T]he most direct one was 8.7 miles, [sixteen] minutes; one was 9.4 miles, [eighteen] minutes; and another -- the third one was 9.4 miles, [seventeen] minutes.

On cross-examination defense counsel for codefendant Lewis elicited the

following testimony intended to bolster Lewis's alibi:

Q     Okay. How about the . . . distance of [sixteen] miles.  Did you calculate a time off the Google Maps from the tower to 1107 First Avenue?

A     [Sixteen] minutes you mean?  It's -- the [sixteen] minutes is 8.7 miles.  There's no [sixteen] miles anywhere.

Q     You're right.  Yeah. I stand corrected.  Right.  The second alternative was 8.7 miles.  That would have taken [sixteen] minutes?

A     Yes.

Q     So then the time of arrival would be -- correct me if I'm wrong -- about 10:16 [p.m.] if the person left right away.

A     Give or take a minute, yes.

Q     Right.  And the third alternative was [eighteen] minutes.  So it's a couple minutes over that.  Over the last time.

A     Yes.

52

A-1006-23

Q      Okay.  So all in all . . . it would have been possible . . .to travel from the tower to the 1107 in about a half hour.

A      Sure.  I don't see why not.

In closing, Lewis's counsel argued that Lee testified credibly that she was with defendant at his home on the evening of the shooting because her version of events fit the timeline established by Chang's testimony,

> And, about . . . Loretta Lee, her assertion to [Detective Calixto] that she was there between ten and one, that time interval.  So, what . . . Chang has to do is to get [the] cell tower information of . . . where her phone was and how far it would have been from her location to the 1107, in that time and see if it was feasible.  In fact it was feasible.

During summation, the State told the jury that Chang's testimony concerned information gathered "from Ms. Lee's alleged phone number, about where that phone was pinging on November 6, 2019."  In closing, the State argued that Chang's testimony discredited Lewis's alibi that he was with his mother on the night of the shooting, stating:

> She can't account for November 6th, because she wasn't with Mr. Lewis.  And, she realized it up there.  And, we know from Investigator Chang her phone was nowhere near that house.  The last call ended at 10:01, and then all of a sudden she shows up to -- yesterday on the stand and says I remember when I got there.  It was 10:20 p.m. exactly, on the dot.  But, do you remember Investigator Chang's testimony when [defense counsel]

53

asked him to do that math? How long would it take her to get there? Oh, about 10:19 she -- they would have gotten there. That's very convenient that she makes up 10:20. But, you learned that she never remembered the time when she told investigators previously.

B.

In his supplemental brief, defendant argues that the holding in Hannah establishes that "in order to geolocate a phone with technical data . . . the State must use an expert witness to explain the scientific basis for the opinions offered . . . ." Defendant further contends that both the GPS data acquired from the rental SUV, assembled via the Geotime software, and the cell-tower information, assembled via Graykey and Cellbrite, required expert testimony to be admissible.

In Hannah, the Supreme Court was specifically concerned with cell site location information (CSLI). In that case, the State presented lay witness testimony from an investigating detective that the defendant was inside the victim's vehicle because his phone pinged cell towers a certain number of miles from the car's known location and the phone continued to ping towers on a path correlating to the route of the car. 263 N.J. at 418. In summation, the prosecutor told the jury that "a cell phone must be close to the tower it connects to, stating that its proximity must be 'a stone's throw' away." Ibid. The Court concluded

that the testimony was improperly admitted and should have been "presented by a witness qualified as an expert pursuant to N.J.R.E. 702 because the technical aspects of CSLI are beyond the ken of the average juror." Id. at 442.

In particular, the Court was concerned with the "intricacies and nuances of cell towers" to glean location information. Id. at 445. As the Court explained, "[t]he relevance of CSLI can be understood by a jury only when it has a better grasp of how cell towers and cell phones interact. This requires an understanding of cell tower sectors, direction, and maximum coverage range, and the many factors, such as terrain and topography, that impact whether a cell phone connects to the closest tower or to one that is farther away." Ibid. The Court drew a bright line rule with respect to CSLI, rejecting the trial court's attempts to distinguish between CSLI testimony simply presenting information regarding tower locations, and the technical aspects of how the towers operate. See id. at 442.

In rejecting the State's argument, the Court explained,

> [t]he State argued that any layperson, including members of the jury, can determine and plot locations of cell towers by using the towers' longitude and latitude provided in the records and inputting those numbers into an internet mapping application. Although a jury may be able to figure out the location of cell towers using phone records, it would not be able to draw any meaningful inferences from that

information without an understanding of how cell towers operate and why those cell tower locations matter. And, in the absence of expert guidance, a jury could attribute more or less weight to the tower locations than is warranted.

[Id. at 445.]

In sum, the Court concluded that expert testimony is required to present CSLI evidence so that jurors can appropriately understand the interaction between the cell phone and the tower.

Here, Chang's testimony regarding evidence obtained from Geotime is distinguishable from CSLI. Chang testified that he received the "raw" GPS data from Detective Calixto and entered that information into Geotime. Chang further testified that he could replicate the information Geotime produced by manually placing the GPS coordinates on a map; however, it was faster to use the software. Unlike CSLI, nothing in Hannah suggests that GPS evidence categorically requires expert testimony to determine precise location. See 263 N.J. at 436 ("CSLI, by definition, is not exact. Exact location information must instead be obtained via GPS"); see also State v. Burney, 255 N.J. 1, 22 (2023) ("Unlike the more precise location data provided by [GPS], cell site analysis simply confirms that the phone was somewhere within the coverage radius of

the cell tower during the recorded activity.").[11] "Generally, the accuracy of GPS devices is accepted." State v. McDuffie, 450 N.J. Super. 554, 570 (2017). We recognize that expert testimony may be required where the accuracy or trustworthiness of the evidence can be called into question. See State v. Martini, 160 N.J. 248, 263 (1999). However, the GPS data in this case was corroborated by surveillance videos and law enforcement's observations of the SUV. For example, Kavanagh testified that he observed the SUV leave Delsea Gardens and head to a nearby bar at about 1:18 a.m. The GPS coordinates indicate that the SUV turned into the bar at 1:19 a.m., and video surveillance shows Gross at the bar at about 1:20 a.m. In these distinctive circumstances, expert testimony was not necessary with respect to the GPS evidence.

We likewise conclude that MacDonald's testimony related to his use of Graykey and Cellebrite to extract and interpret data from Lewis's phone does not fall within the purview of Hannah and did not require expert testimony.

---

[11] We acknowledge that in State v. French G. Lee, __ N.J. ___ (2026), our Supreme Court recently held that the trial court should have held a pretrial hearing on the admissibility of expert testimony regarding fingerprint evidence where defendant raised legitimate issues as to the reliability of that testimony. (slip op. at 21). By contrast, the trial court in this case conducted pretrial hearings to address defendants' challenges to the admissibility of evidence.

We note that "[c]ourts in New Jersey have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." State v. Miller, 449 N.J. Super. 460, 471 (App. Div. 2017) (quoting State v. LaBrutto, 114 N.J. 187, 198, 553 A.2d 335 (1989)). MacDonald's testimony was permissible lay opinion testimony based on his personal knowledge and nine years of experience using Cellebrite and Graykey in his role as a detective. See N.J.R.E. 701 ("If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue."). Accordingly, the trial court properly admitted MacDonald's testimony as lay opinion pursuant to N.J.R.E 701.

However, given the guidance set forth in Hannah, we conclude that Chang's testimony regarding the location of cell towers was improper because he was not qualified as an expert pursuant to N.J.R.E. 702. The Hannah Court made clear that expert testimony is required to present CSLI evidence because "the technical aspects of CSLI are beyond the ken of the average juror." Id. at 442. Although the trial court limited Chang's testimony to tower location, the

Hannah Court rejected similar attempts to distinguish between CSLI testimony regarding tower locations, and the technical aspects of how the towers operate. See 263 N.J. at 442. Chang's testimony regarding the distance between tower locations and certain addresses is precisely what the Hannah Court cautioned against and determined requires expert testimony to be admissible. See id. at 445 ("[I]n the absence of expert guidance, a jury could attribute more or less weight to the tower locations than is warranted."). Because Chang was not qualified as an expert, his testimony regarding tower locations should not have been admitted.

C.

However, our inquiry does not end there. We must next address whether, in these circumstances, permitting lay witness testimony regarding CSLI requires reversal.

"A trial error is defined as an 'error which occurred during the presentation of the case to the jury,' and therefore may 'be quantitatively assessed in the context of other evidence presented in order to determine whether it was harmless beyond a reasonable doubt.'" Camacho, 218 N.J. at 547 (quoting Fulminante, 499 U.S. at 307-08). "When we consider whether a given error is harmless, that error 'must be evaluated in light of the overall strength of the

59

State's case.'" Allen, 254 N.J. at 550 (quoting Galicia, 210 N.J. at 388). "[I]n appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial." Ibid. Admission of evidence that should have been presented through expert testimony may still be considered harmless. See, e.g., State v. Derry, 250 N.J. 611, 634 (2022) (concluding that although the officer's testimony was improperly admitted as lay opinion testimony and may not have satisfied the requirements for expert testimony, the error was harmless given the overwhelming evidence against defendants).

Balancing the error against the strength of the State's case, we find that the admission of Chang's testimony related to CSLI was harmless beyond a reasonable doubt. First, unlike Hannah, the tower location testimony in this case was used to discredit an alibi witness, not to establish defendant's location at a particular time. Moreover, the alibi witness' credibility was already impeached by her own inconsistent testimony at trial. We note that counsel for Lewis advocated for cross-examination on this issue and incorporated Chang's testimony in its closing argument to bolster Lewis's alibi. We further note that

defendant's counsel did not object to this testimony before the trial court, implicating the plain error standard on review.[12]

We, however, need not reach a determination whether the error was invited or constituted plain error because we conclude that the overwhelming evidence against defendants, particularly considering Gross' testimony against them, renders the admission of Chang's testimony harmless. Specifically, the jury heard Gross's testimony that he, Lewis, and defendant planned and orchestrated the shooting. At trial, Gross identified himself and Lewis at Harris's door on the surveillance footage captured from the night of the shooting. In light of the strength of the State's case, we hold that any error in admitting Chang's testimony regarding cell tower location did not affect the outcome and was harmless beyond a reasonable doubt.

---

[12] We note that under the invited error doctrine, errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). Moreover, because defense counsel failed to object to the admission of CSLI testimony below, the issue is subject to plain error review. See R. 2:10-2. However, we need not determine whether the error was invited or constituted plain error, because we find it was harmless considering the strength of the State's case.

A-1006-23

V.

Finally, we address defendant's sentencing argument. Defendant argues that "the sentence imposed is manifestly excessive and unconstitutional." Specifically, defendant first argues that "there was no jury finding of the statutory predicates for a discretionary extended term." Second, defendant argues that "the judge plainly misstated the applicable sentencing range," and thus, "miscalculate[ed] the 'midpoint' between the lowest and highest available sentences" Finally, defendant argues that the judge improperly evaluated the aggravating factors. We are unpersuaded by defendant's arguments.

In considering the length of defendant's sentence, the sentencing court first found defendant eligible for an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). The court found:

> Upon consideration of the application of the prosecutor the court finds that the defendant meets the definition of a persistent offender pursuant to 2C:44-3a. . . . The offense for which the defendant is pending is a first degree offense and the defendant was convicted on at least two separate occasions of two crimes committed at different times. On each of those prior offenses the defendant was over the age of eighteen. Lastly, the last offense occurred within ten years of defendant's release from confinement or sentencing on that last offense.

It then found aggravating factors three ("[t]he risk that the defendant will commit another offense"), six ("[t]he extent of the defendant's prior criminal

62

record and the seriousness of the offenses of which the defendant has been convicted"), and nine ("[t]he need for deterring the defendant and others from violating the law")[13] applicable, and no mitigating factors. Based on these findings, the court reasoned:

> The sentencing range on a first[-]degree offense subject to an extended term is between twenty years and life. That is the statutory range and I discussed that with your attorneys when we talked about what is the normal range. That is the normal range. That's not the normal range. That's the extended term range.
>
> So I start from the position of, well where's our midpoint? Where is the midpoint between twenty years and life? Life is seventy-five years. Midpoint between twenty years and life I think is forty-two-and-a-half years. That's the midpoint.
>
> Therefore, on count two . . . defendant shall be committed into the custody of the Commissioner of the Department of Corrections for a period of thirty-six years and must serve eighty-five percent of the sentence imposed before becoming eligible for parole. NERA applies.

## A.

On appeal, defendant argues that pursuant to State v. Carlton, 480 N.J. Super. 311 (App. Div. 2024), certif. granted, 260 N.J. 478 (2025), rev'd, 262

---

[13] N.J.S.A. 2C:44-1(a) (3), (6), (9).

N.J. 629 (2026), which was issued following the U.S. Supreme Court's decision in Erlinger v. United States, 602 U.S. 821 (2024), this matter should be remanded for resentencing because only a jury, not a judge, can find that he satisfies the elements of the persistent offender statute.

While this case was pending, and following submission of the parties' briefs, our Supreme Court rendered its decision in State v. Carlton, 262 N.J. 269 (2026). It is not disputed that Erlinger abrogated New Jersey's persistent offender statute to the extent that N.J.S.A. 2C:44-3(a), as presently drafted, provides that certain predicate facts are to be found by a court rather than a jury. The critical issue presented to our Supreme Court in Carlton was whether a violation of the Erlinger rule could be harmless constitutional error. The Court concluded that "errors in failing to submit sentencing factors or elements to a jury, as in Apprendi and its progeny, are presumptively subject to harmless error analysis, not automatic reversal." Carlton, 262 N.J. at 643. The Court further held that before a constitutional error can be considered harmless, the reviewing court must be convinced beyond a reasonable doubt that the error did not affect the outcome. Id. at 642. Stated another way, the record must provide meaningful appellate review and demonstrate that only one outcome would have been possible at trial. Id. at 645.

The Court thus held that the harmless constitutional error doctrine applies to Erlinger violations provided that "the relevant facts are undisputed, the sentencing court's reasoning fully articulated, and the record demonstrates, beyond any reasonable doubt, the sole conclusion a jury could have reached had Erlinger been in place at the time of sentencing." Id. at 644. Applying that test, the Court found the constitutional error in that case was harmless beyond a reasonable doubt. Id. at 645.

Here as in Carlton, we are satisfied the constitutional error in this case is harmless beyond a reasonable doubt. First, the relevant facts are undisputed. The State presented evidence that defendant was convicted of two separate crimes in Connecticut on separate dates in 2015, and again in 2017, that were equivalent to indictable crimes under New Jersey law. During defendant's sentencing hearing, his counsel acknowledged and did not dispute those prior offenses. Moreover, the sentencing court's reasoning was fully articulated.

Defendant did not object to the form of the evidence presented to the sentencing court. Nor did defendant dispute the validity or accuracy of the predicate facts presented by the State. Based on the uncontested documentary evidence, the sentencing court made all required findings to establish eligibility for an extended term under N.J.S.A. 2C:44-3(a).

A-1006-23

Applying the <u>Carlton</u> harmless constitutional error rule, we therefore conclude that the State has established beyond any reasonable doubt that defendant has prior convictions that make him eligible for an extended term, and that the sole conclusion a jury could have reached is that defendant is eligible to be sentenced as a persistent offender as defined in N.J.S.A. 2C:44-3(a). Accordingly, as in <u>Carlton</u>, the <u>Erlinger</u> violation in this case is harmless constitutional error.

B.

As for defendant's other sentencing arguments, first, he argues "the judge plainly misstated the applicable sentencing range when he declared it to be 'between twenty years and life,'" and because of that misunderstanding, the court was "immediately . . . off on the wrong track" insofar as its calculation of a midpoint.

Once the decision has been made that the N.J.S.A. 2C:44-3 criteria renders the defendant eligible for an extended term, the range of available sentences runs from the bottom of the ordinary term to the top of the extended term. <u>State v. Pierce</u>, 188 N.J. 155, 168 (2006). Thus, defendant is correct that the judge erred when he said the applicable sentencing range was between twenty years and life. The actual sentencing range was between ten years and life. Despite this

misstatement, however, the judge's calculations were correct. The midpoint between ten and seventy-five is forty-two and a half—which is the number the judge ultimately used in arriving at his sentencing decision. Therefore, defendant was not prejudiced by the judge's misstatement, especially considering defendant was sentenced to a thirty-six-year term, well below the midpoint.

Finally, defendant argues that the court impermissibly double counted when it relied on defendant's prior convictions to establish extended-term eligibility and aggravating factors three, six, and nine. As demonstrated in the record, however, in finding that aggravating factors three, six, and nine applied, the court considered defendant's entire record and not just the offenses supporting his extended-term eligibility. The court properly considered defendant's age, nature of his prior offenses, and personal circumstances in rendering its decision. We are thus unpersuaded that the court engaged in impermissible double counting.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-1006-23